[Cite as *State v. Starner*, 2009-Ohio-5770.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                       CASE NO. 9-09-01

    v.

DANNY E. STARNER,                         O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 08-CR-0097

**Judgment Affirmed**

Date of Decision:  November 2, 2009

APPEARANCES:

    *William S. Lazarow* **for Appellant**

    *David J. Stamolis* **for Appellee**

**SHAW, J.**

{¶1} The defendant-appellant, Danny E. Starner (hereinafter "Starner"), appeals the December 10, 2008 judgment of the Court of Common Pleas of Marion County, Ohio, finding him guilty of eight counts of gross sexual imposition and fourteen counts of rape and sentencing him to an aggregate sentence of life imprisonment with parole eligibility after serving thirty years.

{¶2} The facts relevant to this appeal are as follows. Starner married Nancy McDaniel sometime in the early 1990's. At the time of their marriage, Nancy had two daughters, Vicky and Yvonne. Vicky eventually had two children, Doug, born April 26, 1995, and Meg, born May 28, 1998. Yvonne also had a child, Emma, who was born on May 9, 1994.

{¶3} By age four, Emma was living with her father and step-mother and visiting with Nancy and Starner on occasion. Two years later, Yvonne moved to Pennsylvania and was unable to exercise her bi-weekend visitation with Emma. Instead, Nancy and Starner began exercising these visitation periods with Emma. For the next several years, Emma visited her grandmother and Starner, whom she called "Poppy," every other weekend.[1]

{¶4} In late June, 2007, Nancy was diagnosed with cancer, which was found to be terminal in August of that year. During the next several months,

---

[1] As Emma became older, these visitations did not always occur because Emma wanted to do more with her friends. However, she continued to visit at least once a month from the time she was twelve until her grandmother's death.

Vicky and Starner cared for Nancy as her condition deteriorated. On February 4, 2008, Nancy died. Shortly after Nancy's death, Emma revealed that Starner sexually abused her nearly every time she visited since she was six or seven years old. These acts included him touching her breasts, vagina, and buttocks, having her touch his penis, having her sit on top of him and move back and forth against his penis, inserting his penis into her mouth, and him placing his mouth on her vagina. Emma also revealed that Starner showed her photographs on his computer of adults who were nude, both male and female, had her sit on his lap and watch films of adults having sex, and took photographs of her both while she had her clothing on and off. Further, Emma stated that Starner would ejaculate in a cup on occasion, and they would look at his semen under a microscope.

{¶5} Emma further stated that the appellant also involved her cousins, Doug and Meg, in at least one of these incidents by playing a game called "Truth or Dare" and having the children touch one another. She stated that all of these incidents occurred largely at her grandparents' home, in a cornfield and/or a stream nearby, and at an apartment building owned by Starner.

{¶6} Around the same time that Emma first disclosed this information, her cousins, Meg and Doug, also revealed that Starner had engaged in sexual activity with them. They disclosed that they would take walks with Emma and Starner. During one of these walks, the children took their clothes off and played in a stream. They then went to a nearby cornfield where the children and Starner

pulled their pants and underwear down and played "Truth or Dare." Starner's erect penis was exposed during this time. In this game, Starner had Emma and Doug "French kiss" one another, had Emma touch Doug's penis, had Doug touch Emma's vagina, and had Doug kiss Emma's vagina.

{¶7} Based on these disclosures, a criminal investigation was conducted by the Marion County Sheriff's Office. During this investigation, two search warrants were executed on Starner's home, one on February 20, 2008, and one on March 5, 2008. The investigators seized numerous computers, hard drives, USB drives, computer accessories, cameras, girls' underwear, and a microscope in these searches. Many of these items, including a DNA standard from Starner and Emma, were sent to the Bureau of Criminal Identification and Investigation ("BCI") for analysis. No DNA belonging to Starner was found on any of Emma's clothing that was seized pursuant to the warrant nor was any of his DNA found on the microscope.

{¶8} A forensic analysis of the electronic equipment found numerous photographs of Emma clothed, some of which show her in seemingly provocative poses. However, no nude photographs of Emma or any other children were found. The analysis did find several photographs of nude adults on the computer hard drives. These photos contained images of various sexual acts being performed, and several photos focused on the vaginal areas of the depicted subjects. In addition, a program entitled "Evidence Eliminator" was found, as was evidence of

its installation and use, on two of the computers seized from Starner's home. This program is designed to permanently remove files in their entirety from a hard drive. Further analysis showed that Evidence Eliminator was last accessed on one of the computers on the morning of February 20, 2008, the day of the first search of Starner's home.

{¶9} The analysis also discovered a number of sexually explicit stories on the hard drives. The subject matter of the vast majority of these stories centered around acts of incest and the molestation of children. Some of these stories also had titles illustrative of their content. For instance, one such story was titled: "Dirty Little Fuckers (Incest brother-sister-cousins/preteen/zoo sex girl-dog)."

{¶10} On March 5, 2008, Starner was indicted on thirteen counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), all third degree felonies, and nineteen counts of rape of a child under the age of thirteen in violation of R.C. 2907.02(A)(1)(b), all first degree felonies. Six of the rape charges included additional specifications that the victim was less than ten years of age at the time of the offense, rendering these charges eligible for the imposition of sentences of life in prison. Starner was re-indicted on April 30, 2008, for all of the same offenses. The purpose of this indictment was to include a mens rea for each offense in accordance with a recent decision of the Ohio Supreme Court.

{¶11} The case progressed through discovery, and Starner retained his own computer expert to review the evidence and BCI's conclusions. Throughout these

proceedings, counsel for Starner filed numerous motions, including a motion in limine to prevent the State from introducing "as evidence at trial, or use in cross-examination of witnesses, the term 'Evidence Eliminator.'" This motion, along with several others not at issue in this appeal, was heard by the trial court on September 29, 2008, but the trial court reserved its ruling on the issue until the time of the trial.

{¶12} The trial in this matter was held from October 20-24, 2008, and concluded on October 27, 2008. Prior to beginning voir dire, the trial court overruled Starner's motion in limine as to the use of the term "Evidence Eliminator." A jury was then seated and trial commenced.

{¶13} During its case-in-chief, the State presented eighteen witnesses, including Emma, Doug, Meg, Vicky, and Emma's father. The State also called the BCI computer analyst, Jim Hawke, who testified about the Evidence Eliminator program as well as other findings he made in his analysis. Additionally, the prosecution introduced numerous exhibits, including the computer equipment and the sexually explicit stories previously referenced.

{¶14} Counsel for Starner made a motion for acquittal, pursuant to Criminal Rule 29, after the State rested its case. This motion was denied, but the State then moved to dismiss four counts of gross sexual imposition and five counts of rape, four of which included life specifications. Without objection, this motion

was granted. Defense counsel then presented nine witnesses and one exhibit on behalf of Starner.

{¶15} At the conclusion of closing arguments by the parties, the State moved to dismiss an additional count of gross sexual imposition. The jury was then instructed on the remaining twenty-two counts. On October 27, 2008, the jury returned verdicts of guilty on each charge.

{¶16} On November 24, 2008, the court held a sentencing hearing. Starner was sentenced to five years of imprisonment on each of the eight counts of gross sexual imposition (Counts 2 and 6-12). These sentences were ordered to run concurrently to one another. He was also sentenced to a term of life in prison on the two counts of rape of a child under the age of ten (Counts 17 and 19), which were ordered to run concurrently with one another.[2] Ten of the rape counts were given ten-year sentences (Counts 21-30), and the last two rape counts were given terms of imprisonment of ten years to life (Counts 31-32).[3] These twelve rape counts were ordered to run concurrently to one another. However, this group of counts, the gross sexual imposition group of counts, and the rape of a child under the age of ten group of counts were all ordered to run consecutively to each other for an aggregate sentence of thirty years to life in prison.

---

[2] An offender sentenced to life imprisonment for these two offenses is eligible for parole after serving ten years under the statute in effect at the time these offenses were committed.
[3] The last two counts of rape occurred after January 2, 2007, which placed them under a different sentencing scheme than the other ten counts.

{¶17} This appeal followed, and Starner now asserts four assignments of error.

**ASSIGNMENT OF ERROR NO. I:**

**PROSECUTORIAL MISCONDUCT DEPRIVED DANNY STARNER OF HIS RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. FEDERAL CONSTITUTION AND ARTICLE 1, § 2, 10 AND 16 OF THE OHIO CONSTITUTION.**

**ASSIGNMENT OF ERROR NO. II:**

**THE TRIAL COURT ERRED IN PERMITTING THE STATE TO INTRODUCE IMPROPER AND PREJUDICIAL COMPUTER TESTIMONY. AS A RESULT, THE TRIAL COURT VIOLATED STARNER'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. FEDERAL CONSTITUTION AND ARTICLE I, § 2, 10 AND 16 OF THE OHIO CONSTITUTION.**

**ASSIGNMENT OF ERROR NO. III:**

**THE RESPRESENTATION PROVIDED TO DANNY STARNER FELL FAR BELOW THE PREVAILING NORMS FOR COUNSEL IN A CRIMINAL CASE, WAS UNREASONABLE, AND AFFECTED THE OUTCOME IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AS WELL AS ART. I, § 2, 9, 10, AND 16 OF THE OHIO CONSTITUTION.**

**ASSIGNMENT OF ERROR NO. IV:**

**THE TRIAL COURT ERRED IN ENTERING JUDGMENT AGAINST DANNY STARNER SINCE THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S.**

**FEDERAL CONSTITUTION AND ART. I, §2, 10, AND 16 OF THE OHIO CONSTITUTION.**

{¶18} For ease of discussion, we elect to address the assignments of error out of the order in which they were presented.

*Second Assignment of Error*

{¶19} In his second assignment of error, Starner maintains that the trial court erred in allowing the testimony of Agent Jim Hawke of BCI regarding the use of the Evidence Eliminator program. Specifically, he asserts that Agent Hawke should not have been permitted to testify as to what the program is capable of doing and how it is marketed. In support of this contention, Starner asserts that this testimony failed the *Daubert* test for scientific reliability. See *Daubert v. Merrell Dow Pharmaceuticals* (1993), 509 U.S. 579, 113 S.Ct. 2786.

{¶20} Initially, we note that the admission of evidence is left to the discretion of the trial court and will be reviewed on an abuse of discretion basis. *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960. However, at the trial, counsel for Starner only objected to the reference to the name "Evidence Eliminator" and to the reference to the marketing information found on the program's website. Counsel never objected to the qualifications of Agent Hawke in computer forensics, to his testimony that he found this program on a computer recovered from Starner's home, to his testimony about the program's capabilities, or to the admission of any evidence pursuant to *Daubert*, supra.

**{¶21}** Failure to object at trial to the admission of evidence waives any claim of error absent plain error. *State v. Williams* (1977), 51 Ohio St.2d 112, 364 N.E.2d 1364.

> **Pursuant to Crim.R. 52(B), plain errors or defects which affect substantial rights may be grounds for reversal even though they were not brought to the attention of the trial court. Notice of plain error, however, applies only under exceptional circumstances to prevent a manifest miscarriage of justice.... "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise."** *State v. Moreland* **(1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899.**

*State v. Phillips,* 74 Ohio St.3d 72, 83, 656 N.E.2d 643, 1995-Ohio-171. Thus, it is within these constructs that we examine this assignment of error.

**{¶22}** In the case sub judice, Agent Hawke testified that his analysis of the computers that were seized revealed that Evidence Eliminator was installed on two of them. State's Exhibit 1, a SunPro computer found in Starner's kitchen, showed that Evidence Eliminator Version 6 was installed on the computer on January 8, 2008. Agent Hawke also found remnants of an earlier version of Evidence Eliminator on this computer. The analysis of this exhibit also revealed that this program was accessed several times, including at approximately 7:29 a.m. on the day Starner's home was first searched. In addition, multiple compact discs containing this program, labeled State's Exhibits 22A and 23A, were recovered from Starner's home.

**{¶23}** Agent Hawke testified that Evidence Eliminator is "marketed as a program to delete and overwrite data basically so that – to delete – we call it antiforensic program to delete the tools that I use in the laboratory to get the data back. It makes it so that I can't find the data because it's destroyed." (Trial Trans. p. 616.) No objection to this testimony was made. He also testified that "one of the things it does is it overwrites data that's on the hard drive." (id. at 617.) No objection to this testimony was made. He went on to testify that Evidence Eliminator advertises that "it defeats the forensic tools we have to use to get the data back to be used as evidence or information in an investigation." (id. at 623.) The defense objected to this testimony based upon hearsay. This objection was overruled as not being offered for the truth of the matter asserted, but rather being offered as to how it was marketed. The trial court also instructed the jury that it was not offered as to the truth of what was being asserted in its marketing but merely as to what the advertising for it was.

**{¶24}** Contrary to Starner's assertions in his brief to this Court, the testimony about the marketing of Evidence Eliminator had nothing to do with any expert scientific testing or other such specialized information. Anyone with basic computer skills could find the website on the Internet and view how it is marketed. Thus, the *Daubert* test for scientific reliability was unnecessary.

**{¶25}** The only question remaining is whether this testimony was relevant and, if so, whether its probative value was substantially outweighed by its

prejudicial effect. Evidence Rule 402 allows for the admission of all relevant evidence. However, Evid.R. 403 prohibits the use of relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." As the Ohio Supreme Court observed:

> **[I]t is fair to say that all relevant evidence is prejudicial. That is, evidence that tends to disprove a party's rendition of the facts necessarily harms that party's case. Accordingly, the rules of evidence do not attempt to bar all prejudicial evidence-to do so would make reaching any result extremely difficult. Rather, only evidence that is *unfairly* prejudicial is excludable.**

(Emphasis sic.) *State v. Crotts*, 104 Ohio St.3d 432, 820 N.E.2d 302, 2004-Ohio-6550, at ¶ 23; see, also, Weissenberger's Ohio Evidence Treatise (2007 ed.) 107-08, Section 403.3 (stating: "If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word 'unfair'").

{¶26} Emma reported that photographs had been taken of her in states of dress and undress, that the defendant showed her photographs of nude women engaging in sexual acts, and had shown her pornographic videos on the computer. Based upon this information, inter alia, a search of the computers and other equipment was conducted. Although photos of Emma clothed and photographs of nude women engaging in sexual acts were found in the computer analysis, no nude photos of Emma or pornographic videos were discovered. However, Evidence

Eliminator was found on two of the computers and was accessed on multiple occasions, including during Nancy's illness and after her death.

**{¶27}** This program's purported advantage over other programs designed to clear hard drive space, such as "File Shredder," was that it left no traces of the items removed and defeated forensic computer analysis technology, hence its name: "Evidence Eliminator." Thus, its name was not innocuous. The relevance of a program like Evidence Eliminator was that it served as a possible explanation for there being no photographs of Emma undressed or any other children and no pornographic videos.

**{¶28}** Moreover, this program was accessed after Nancy's death and after Emma and the other children told of the abuse, as well as when Nancy was ill. In addition, the hard drive that contained several pornographic photos of women, several photos of Emma, some of which were in provocative states, and numerous erotic stories was found in the attic. However, this drive had been accessed as recently as February 16, 2008. Thus, it could not have been in the attic for more than four days before it was seized.

**{¶29}** All of this combined to create an inference that Starner acted in ways to conceal any criminal wrongdoing, i.e. consciousness of guilt. Further, it served to explain why the police could not locate other items to corroborate Emma's account of her abuse by Starner. Therefore, the existence of this program, its use, and its name were relevant.

**{¶30}** In addition, its relevancy was not substantially outweighed by the danger of unfair prejudice. The defense presented a theory that Emma and the other two children lied about being abused by Starner because their mothers were upset that Starner received the bulk of their mother's estate and that the abuse never occurred. The testimony regarding Evidence Eliminator, its actual name and advertising hook, and the fact that it was used, as well as other evidence, served to create an inference that Emma was not fabricating her abuse because Starner had a mechanism by which he could have destroyed nude photos of her and other items he believed were problematic. Accordingly, this evidence was not unfairly prejudicial, and the trial court did not abuse its discretion in admitting this evidence.

**{¶31}** We also find that the portions of Agent Hawke's testimony to which there were no objections did not rise to the level of plain error. As previously noted, plain error is to be used in circumstances to prevent a manifest miscarriage of justice. Here, all three children testified, and the jury was able to witness their demeanor and evaluate their candor. Further, the adult pornography and provocatively posed photos of Emma corroborated portions of Emma's testimony and statements at the hospital. In addition, the sixty-one erotic stories mostly of incest and child molestation found on the hard drive in Starner's home, which was last accessed when he was the sole resident of the home, indicated a specific interest in the subject-matter. Therefore, this Court cannot find that, but for the

error in the admission of this testimony, the outcome of the trial would clearly have been otherwise. Accordingly, the second assignment of error is overruled.

### *First Assignment of Error*

{¶32} Starner's first assignment of error involves prosecutorial misconduct. Here, Starner asserts that the prosecution engaged in two different acts of misconduct. First, he maintains that the prosecution engaged in misconduct by introducing testimony concerning the Evidence Eliminator program, which he asserts was inadmissible. Thus, he contends that the prosecution sought a conviction based upon passions and prejudices of the jury rather than upon the evidence. Second, Starner maintains that the prosecution engaged in misconduct during closing arguments by commenting on Starner's failure to testify on his own behalf.

{¶33} "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. The touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor." *State v. Jones,* 90 Ohio St.3d 403, 420, 739 N.E.2d 300, 2000-Ohio-187 (internal citations omitted). An appellate court should consider several factors in making this determination: "(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton* (1995), 102 Ohio App.3d 28, 41, 656 N.E.2d 970. The reviewing court

-15-

should also ask whether the misconduct was an isolated incident in an otherwise properly tried case. *Id.* A prosecutor's misconduct will not be considered grounds for reversal unless the misconduct has deprived the defendant of a fair trial. *Id.*

{¶34} As to the issue of the prosecutor's use of the Evidence Eliminator program, we cannot find that the prosecutor's conduct was improper given our discussion of the second assignment of error. Therefore, we find no merit as to this issue.

{¶35} The second issue concerns the prosecutor's statements regarding Starner's failure to testify. The specific challenged conduct occurred during the State's rebuttal closing argument, in which the following transpired:

> **MR. SLAGLE: * * ***
>
> **Now, I mean, I also just – Mr. Mills starts – from Voir dire he has said it's impossible to prove innocence. He's not under a burden to prove innocence. But it's not impossible to prove innocence anymore –**
>
> **MR. WALDECK: Objection, Your Honor.**
>
> **COURT: Overruled. Go ahead.**
>
> **MR. SLAGLE: It's not impossible to prove innocence. You know, allegation made, you did the crime at a certain time, evidence is presented you didn't do it, evidence is presented you weren't there, you can prove –**
>
> **MR. WALDECK: Renew my objection.**
>
> **COURT: Overruled. That's enough.**
>
> **MR. SLAGLE: They're not under a burden to do that. But don't let 'em mislead you on that.**

(Trial Trans. pp. 1168-9.)  Starner maintains that by making these statements, the prosecution implied that if Starner was not guilty of these offenses, he would have testified.

**{¶36}** The Ohio Supreme Court has held that "it is improper for a prosecutor to comment on the defendant's failure to testify."  *State v. Twyford*, 94 Ohio St.3d 340, 355, 763 N.E.2d 122, 2002-Ohio-894, citing *Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229.  "The question is 'whether the language used was *manifestly* intended or was of such character that the jury would naturally and *necessarily* take it to be a comment on the failure of the accused to testify.'"  *State v. Webb*, 70 Ohio St.3d 325, 328-29, 1994-Ohio-425, 638 N.E.2d 1023, quoting *Knowles v. United States* (10th Cir. 1955), 224 F.2d 168, 170.

**{¶37}**  In the case sub judice, the statements at issue occurred at the onset of the State's rebuttal closing, directly after the defense ended its closing with the following request of the jury:

> **Each one of you I'm asking to consider for yourselves, are you satisfied beyond a reasonable doubt, not just – got a lot of evidence here folks, but beyond a reasonable doubt that Dan Starner is guilty of these things with the understanding that it's impossible to prove innocence.**

(Trial Trans. p. 1168.)  In addition, defense counsel made two other such remarks. During voir dire, the defense asked the jury about reasonable doubt and the presumption of innocence.  Defense counsel included the following statement in this discussion: "I'm not gonna be asking you to find innocent, because I think it's

-17-

almost impossible for me to do and I've done a lot of trials and it's really impossible." (id. at 148.) Also, in an earlier portion of closing argument, defense counsel stated: "One of the problems defense has in every case is the inability to prove innocence, but we bring up something which is a reasonable doubt and we get explanations from the prosecution[.]" (id. at 1151.)

{¶38} The prosecutions remarks were directed at the defense's contention that innocence was impossible to show. The prosecutor gave a specific example of an allegation that a crime occurred at a certain time and that a person could show he/she was not there at that time. The prosecutor also stated that it was not the burden of the defense to do so, but that it was not impossible to prove innocence as the defense claimed.

{¶39} The State is permitted to challenge "the weight of the evidence offered in support of an exculpatory theory presented by the defense." *State v. Collins,* 89 Ohio St.3d 524, 528, 733 N.E.2d 1118, 2000-Ohio-231. "Such comments do not imply that the burden of proof has shifted to the defense, nor do they necessarily constitute a penalty on the defendant's exercise of his Fifth Amendment right to remain silent." *Id*. at 527-28, 733 N.E.2d 1118. Similarly, in this case, the prosecutor was challenging a claim that innocence was impossible to prove. He was not implying that the burden of proof shifted to Starner, which he expressly denied, or that Starner would or should have testified if he was innocent.

Thus, in the foregoing context, these comments did not amount to prosecutorial misconduct, and the first assignment of error is overruled.

*Fourth Assignment of Error*

**{¶40}** In his fourth assignment of error, Starner maintains that the evidence on all twenty-two counts was insufficient to sustain convictions and the findings of guilt as to each were against the manifest weight of the evidence. Reviewing a challenge to the sufficiency of the evidence requires this Court to examine the evidence in the light most favorable to the prosecution. The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.

**{¶41}** Alternatively, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 1997-Ohio-52. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id*. In doing so, this Court must review

the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3rd Dist. No. 1-05-70, 2006-Ohio-3764, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Further, we must be mindful that the credibility to be afforded the testimony of the witnesses is to be determined by the trier of fact. *State v. Dye*, 82 Ohio St.3d 323, 329, 695 N.E.2d 763, 1998-Ohio-234; *State v. Frazier*, 73 Ohio St.3d 323, 652 N.E.2d 1000, 1995-Ohio-235.

{¶42} Upon review of the record, we find that Starner made his Crim.R. 29 motion at the close of the state's case, proceeded to present evidence on his behalf, and then failed to renew his motion for acquittal at the conclusion of all of the evidence. Thus, he has waived all but plain error as to the sufficiency of the evidence. See *State v. Jones*, 91 Ohio St.3d 335, 346, 744 N.E.2d 1163, 2001-Ohio-57. As previously stated, in order to find plain error, there must be a deviation from a legal rule, the error must be an "obvious" defect in the trial proceedings, and the error must affect a defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, 2002-Ohio-68. Reversal on plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage" of justice. *Id*.

{¶43} Starner was charged with multiple counts of gross sexual imposition and rape, involving multiple victims, time periods, and locations. We will address each count as outlined by the indictment, bill of particulars, and the jury instructions.

{¶44} To prove the charge of gross sexual imposition in Count 2 of the indictment, the State had to show that Starner purposely caused two or more other persons to have sexual contact when one of the other persons was less than thirteen years of age whether or not Starner knew the age of the other person. See R.C. 2907.05(A)(4). "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttocks, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶45} This count was alleged to have occurred between June 1, 2006 through December 31, 2007, in a field near 3908 Whetstone River South, Marion, Ohio, and involved the allegation that Starner caused Doug, who was eleven or twelve at the time of the offense, to rub the vagina of Emma, who was twelve or thirteen at the time, and caused Emma to rub Doug's penis.

{¶46} Emma testified at trial that she was born on May 9, 1994. The alleged time frame of June 1, 2006, to December 31, 2007, placed her age at either twelve or thirteen years of age. This time frame created a question as to the required element that the other person was under the age of thirteen at the time of

the offense. However, the other child involved, Doug, testified that he turned thirteen on April 26, 2008, which established his birth date as April 26, 1995. As such, he would have been either eleven or twelve during the alleged time frame. Given this information, at least one, if not both, of the other persons was under the age of thirteen.

{¶47} Emma, Doug, and Meg all testified in regards to Count 2. Emma testified as follows. She recalled taking a walk with Starner and her cousins, Doug and Meg, approximately a month before Nancy became sick in the fall of 2007. She stated that that they walked to a stream and a cornfield near Starner's home and that Starner called each child one-by-one behind a bush and had them remove their clothing. The three children waded in the stream without their clothes while Starner remained clothed. They then put their clothes back on and walked to a nearby field, which was planted with corn at the time. At the cornfield, they played a game called "Truth or Dare." During this game, the children and Starner all had their pants down. Starner then dared Emma to touch Doug's penis with her mouth, which she did. Starner also dared Doug to touch Emma's vagina with his mouth and to rub her vagina, which he did. Starner also dared the two to kiss each other with open mouths, which they did.

{¶48} Emma testified that she showed this field to Deputy John Butterworth of the Marion County Sheriff's Office. She also identified State's

Exhibit 30D as a photograph of the field and State's Exhibit 30I and 30K as photographs of the stream where this incident occurred.

{¶49} Doug, who was in seventh grade at the time of Starner's trial, also testified about this incident. He recalled taking a walk with Emma, Meg, and Starner to a nearby creek. At the creek, the children took their clothes off and waded in the water. They then put their clothes back on and started walking back to Starner's home through a cornfield. At the time, the corn was tall and it was near harvest time, approximately September. He also stated that it was warm enough to wear shorts and a t-shirt but that the water was kind of cold. In addition, he thought he was in fifth or sixth grade when this occurred.

{¶50} Once at the cornfield, all four began playing "Truth or Dare," and all four, including Starner, had their pants and underwear down. Someone dared Doug to rub Emma's vagina,[4] which he did. Although he could not remember who made this dare, he stated that he did not believe it was one of the three children. Someone also dared Emma to rub Doug's penis, which she did. He further stated that neither he nor Emma made this dare and that he did not think Meg made this dare, leaving Starner as the only other possibility. Emma and Doug were also dared to "French kiss," meaning "tongue/tongue kissing," which they did. (Trial Trans. pp. 374, 378.) Doug also kissed the top of Emma's vagina.

---

[4] Doug used the term "private" in referring to both of the body parts that he and Emma touched and kissed. When asked what Emma does from her private and what he does from his private, he answered, "pee." (Trial Trans. p. 378.) Thus, we elect to substitute his use of the term "private" with "vagina" and "penis," with respect to each child's genitalia.

Once again, he did not believe that any of the children issued this dare, leaving only Starner. Doug further testified that Starner's penis was "[s]ticking up a little bit" rather than "hanging between his legs[.]" (id. at 379.)

{¶51} Doug testified that he showed the cornfield where this occurred to Deputy Butterworth. He also testified that he did not tell anyone what happened immediately thereafter, but finally revealed the incident after being repeatedly asked by his mother and step-mother whether Starner did anything to hurt or scare him. During cross-examination, Doug explained that his mother would ask him every time he was with her whether Starner did anything to hurt him and he "finally gave in." (id. at 385.) However, in re-direct, Doug was asked why he decided to tell his mom what had happened. He responded, "Well, I thought it over and it was a pretty nasty thing I was trying to keep quiet, so if I told my mom then maybe she could fix it." (id. at 399.) He also testified that he did not tell his mom or the jury anything merely to make his mom happy and that everything he told the jury and his mom was true. (id.)

{¶52} Lastly, Meg testified about this incident. At the time she testified, Meg was ten-years-old and in the fourth grade. She testified that she took walks with Emma, Doug, and Starner, and that something happened that she did not like on one of these walks. As she began to testify about the incident, she was crying and the prosecution had to tell her that it was okay and to take deep breaths. In fact, the court had trouble ruling on defense objections because of Meg's

"emotional state" and informed the defense that he was going to have to give the State a little latitude because of her condition. (Trial Trans. p. 309.)

{¶53} Meg stated that they walked to the water, and they took their clothes off to play in the water. After the water, they put their clothes back on and went to the cornfield. Meg testified that the corn was yellow, "[l]ike it was ready to be picked[,]" and this happened the previous summer or fall. (id. at 314.)

{¶54} At the cornfield, someone suggested that they play "Truth or Dare." All four, including Starner, had their pants and underwear down. The dares involved Emma kissing Doug and touching one another and some were initiated by Emma. She also testified that Starner put Doug's penis to Emma's vagina.[5] She testified that Emma and Doug were kissing when this occurred and that Starner was the one who dared them to kiss. Meg also saw Emma touch Doug. In addition, she testified that she could see Starner's penis while in the cornfield and that "it was tan and it kind of looked like a fat stick." (id. at 320.) She further indicated that his penis was sticking out ("straight across horizontal"). (id. at 315.)

{¶55} Meg also testified that Starner told her "'don't tell anybody because then he'll get in big trouble and then' – I forgot the other part." (id. at 316.) She kept this secret for a couple of months and then told her mother. She also testified that she told her mother and somebody at Children's Services and that she told them the truth. Further, she thought Starner was a nice guy but that she felt

---

[5] Similarly to Doug, Meg used the term "private," and stated that they pee with their private spots.

"miserable" about what happened in the cornfield because she did not like the things that he did to them. (id.)

**{¶56}** During cross-examination, she admitted that she testified that it happened only once but "[w]hen I think back a little bit more, it did happen more than once." (id. at 317.) She also testified that the weather was a little chilly and that the incident she described happened in 2007.

**{¶57}** The State also presented the testimony of Doug's and Meg's mother, Vicky. She testified that her mother, Nancy, married Starner sometime in 1992 or 1993. She testified that she visited the Starner home quite often after her mother was diagnosed with cancer in the summer of 2007. She usually brought her children, and she would mostly stay with her mother. Starner was also present during these times. She further testified that her mother died on February 4, 2008, and that after her mother's funeral, Emma said something while riding in the car with her that disturbed her. This prompted her to ask her children if there was anything she needed to know about Starner. They initially denied anything happening but eventually told her what happened.

**{¶58}** On cross-examination, the defense asked several questions about Nancy's death, her estate, and whether Vicky and/or her sister were upset that Starner received the bulk of Nancy's estate. However, Vicky testified that she did not have any issues with Starner at the time of Nancy's death, that she appreciated how well he took care of her mother when Nancy was dying, and that all she ever

wanted from Nancy's home was a few of the items that actually belonged to her but that she had left behind when she moved. She further testified that she did not expect to receive anything of value because she knew the bills for her mother's medical care were quite high and that the properties owned by Nancy and Starner were "mortgaged to the maximum." (Trial Trans. at 458.) As to any disputes, she acknowledged that her sister, Emma's mother, had some disputes with Starner over items, such as some Lenox crystal wine glasses, but that she had no similar disputes.

{¶59} Deputy Butterworth, who was assigned by the Marion County Sheriff's Office to investigate this case, also testified. Regarding location, he testified that Starner's home was located at 3915 Richland Road in Marion County, Ohio. Further, he went to the cornfield at issue on Whetstone River South on at least two separate occasions. On one occasion, he met with Emma, and she identified the field as the one where the acts alleged in Count 2 occurred. On another occasion, he met with Doug and Meg, and they identified the same field as the one where the acts alleged in Count 2 occurred. Deputy Butterworth testified that this field was located in Marion County, Ohio, approximately one-half to one mile away from Starner's residence. In addition, the parties stipulated that this field, which was farmed by the Neidhart family, was located within Marion County, Ohio.

{¶60} In addition to Vicky's testimony about Starner's marital status, the parties also stipulated that Starner was married to Nancy and was never married to Emma or Doug, both of whom were children.

{¶61} Lastly, Jill Neidhart, the member of the Neidhart family who documents what the family plants each year in its fields and reports that information to the Farm Service Agency, testified that in 2007, the family planted corn in the seven-acre field on Whetstone River South that was testified to by Deputy Butterworth and the three children, and that this corn would have been harvested by her husband in late October of that year. Additionally, her report of the 2007 crop, marked as State's Exhibit 34, was admitted into evidence.

{¶62} In light of all this testimony, there was sufficient evidence that, if believed, would convince the average mind of Starner's guilt beyond a reasonable doubt on this count. All three children testified to the nature of the contact, including that Doug touched Emma's vagina and Emma touched Doug's penis. There was also testimony that Starner had an erection during this time. Emma expressly testified that Starner issued the dares that resulted in the touching between her and Doug, and Doug and Meg implied through their answers about who was present and who did *not* give the dares that Starner issued these dares. All three children also testified that corn was planted in the field, that it was close to harvest time, and that it happened shortly before or while Nancy was ill. This testimony, coupled with Neidhart's testimony that corn was planted in the

Whetstone field in 2007, placed the time frame of this incident in late summer or early fall of 2007, when Doug was twelve. Thus, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of Count 2, gross sexual imposition, proven beyond a reasonable doubt.

{¶63} Counts 6-12 allege the same offense (gross sexual imposition), same time frame, and same victim. However, various forms of "sexual contact" are alleged. The time frame provided on each of these counts was between May 9, 2001, and May 8, 2007, and are alleged to have occurred against Emma when she was between the ages of seven and twelve. The location provided in the bill of particulars and jury instructions was Starner's home at 3915 Richland Road, Marion County, Ohio, for Counts 6-10, and an apartment building owned by Starner at 331 East Church Street in Marion County, Ohio, for Counts 11 and 12.

{¶64} To prove Count 6, the State had to show that during the alleged time frame, Starner purposely had sexual contact with Emma, who was not his spouse and who was less than thirteen years of age, whether or not Starner knew Emma's age. The alleged contact in this count was the touching of Emma's vagina.

{¶65} To prove Count 7, the State had to show that during the alleged time frame, Starner purposely had sexual contact with Emma, who was not his spouse and who was less than thirteen years of age, whether or not Starner knew Emma's

age. The alleged contact in this count was Starner touching Emma's vagina with his penis.

**{¶66}** To prove Count 8, the State had to show that during the alleged time frame, Starner purposely had sexual contact with Emma, who was not his spouse and who was less than thirteen years of age, whether or not Starner knew Emma's age. The alleged contact in this count was the touching of Emma's breast.

**{¶67}** To prove Count 9, the State had to show that during the alleged time frame, Starner purposely had sexual contact with Emma, who was not his spouse and who was less than thirteen years of age, whether or not Starner knew Emma's age. The alleged contact in this count was the touching of Emma's vagina.

**{¶68}** To prove Count 10, the State had to show that during the alleged time frame, Starner purposely had sexual contact with Emma, who was not his spouse and who was less than thirteen years of age, whether or not Starner knew Emma's age. The alleged contact in this count was the touching of Emma's buttocks.

**{¶69}** To prove Count 11, the State had to show that during the alleged time frame, Starner purposely had sexual contact with Emma, who was not his spouse and who was less than thirteen years of age, whether or not Starner knew Emma's age. The alleged contact in this count was the touching of Emma's vagina.

{¶70} To prove Count 12, the State had to show that during the alleged time frame, Starner purposely caused Emma, who was not his spouse and who was less than thirteen years of age, to have sexual contact with him by having her touch his penis, whether or not Starner knew Emma's age.

{¶71} As previously noted, Emma testified that she was born on May 9, 1994. Thus, she would have turned seven-years-old on May 9, 2001, the first date alleged and would not have turned thirteen-years-old until May 9, 2007, one day after the last date alleged in these counts. As to each of these counts, Emma testified that when she was around six-years-old, Starner began touching her "inappropriately." (Trial Trans. pp. 227-8.) This began with him touching her chest and her buttocks and then he would touch her vagina. She also testified that he would begin by touching her over her clothes but that he would then touch her underneath her clothes. Emma stated that after touching her he would "lay his penis on his stomach and have me sit on it[,]" while both were completely nude. (id. at 231.) Starner would also have her move back and forth toward him while she was sitting on top of him and that sometimes he would place his hands on her hips and move her in this manner. According to her testimony, his penis would get bigger during this time and that "white stuff" would come out of his penis. (id. at 233.)

{¶72} Emma also testified that when she was "about 8 or 9," Starner began having her touch his penis. Specifically, he would have her move her hands up

and down on his penis while both were nude. When she did this, his penis became bigger and he would ejaculate. She also testified that Starner bought her a microscope for Christmas one year because she liked CSI. At times, he would have her rub his penis until he ejaculated into a cup, which they would then place under the microscope to examine his sperm. Additionally, Emma testified that Starner had her shower with him approximately seven or eight times and that he touched her vagina, breasts, and buttocks during these showers. However, during these showers, Starner did not ejaculate.

{¶73} Emma testified that these acts occurred nearly every time she visited her grandmother and Starner and that she visited them every other weekend. She also testified that these acts would usually happen in Starner's bedroom when her grandmother was shopping, at work, or in school but that on at least one occasion, he did these things in the kitchen and in the living room. More specifically, she testified that on one occasion, Starner had her sit naked on a chair in the kitchen, close her eyes, and guess what he was placing on her vagina. Although she stated that she thought it was his finger, when she opened her eyes, his penis was on her vagina. (id. at 238.)

{¶74} She also testified that some of these acts would occur at an apartment building where Starner's daughter, Dani, lived. Emma testified that she began cleaning the apartments when she was nine to earn money to attend horse camp. However, Starner would pay her extra money when they were at the

apartments if she would touch his penis. He also would touch her vagina and her breasts during these times. However, she stated that the acts at the apartment building only occurred two to three times and that she was nude only one or two times at the apartment building. Further, these acts occurred in vacant apartments in the building.

{¶75} Emma never revealed this abuse until her grandmother died. She testified that she was in the car with her mother on the way to get clothes for Nancy's funeral when her mother asked if Starner had ever done anything that made her uncomfortable. At that time, she asked her mother if they could discuss it later, and her mother did not ask her again. However, shortly thereafter, Emma was hospitalized for a cyst. While at the hospital, her father asked her a similar question after he spoke with her mother. Once again, Emma did not want to say anything to him, but instead, she spoke to a counselor at the hospital and told her about these incidences.

{¶76} Emma testified that she felt more comfortable speaking to a woman and to someone outside of her family because she did not "want to see the reaction on their [her family's] face when [she] told them." (id. at 272.) She stated that she was scared that her family would be mad, that Starner had told her that they would both get in trouble, and that she was afraid that she would get in trouble because she "let it happen or something like that." (id.) Emma also testified that when the abuse began, she thought it was normal, but she first became aware that

-33-

it was wrong when she watched a video in school when she was about twelve-years-old.

**{¶77}** During cross-examination, Emma admitted that she still did not report the abuse even after watching the school video and realizing that it was wrong. She also testified that the kitchen where one of the incidences occurred was well-lit and not hidden. In addition, she testified that the door to the home was not kept locked and anyone could have entered at any time. Emma also could not recall a specific time of day or day of the week when any of these incidences occurred. Further, she acknowleged sitting on Starner's lap at his home and telling him she loved him while visiting Nancy during the last week of her life. Emma admitted to asking Starner to buy her some horses during this visit and to becoming upset with him when he told her "no."

**{¶78}** She also admitted that she enjoyed spending time with Nancy and Starner, had good times with Starner, loved Starner, and wanted to continue to see him even after her grandmother died. Additionally, she felt closer to Starner than she did to her mother.

**{¶79}** In addition to Emma's testimony, the State presented the testimony of Emma's father, Jarrett. Jarrett testified that Emma was born on May 9, 1994. When Emma was approximately six or seven-years-old, she began going to the Starner home every other weekend to visit with Nancy and Starner. At that time, Emma's mother was moving to Pennsylvania, and Jarrett wanted Emma to have a

relationship with that side of her family. This visitation consistently occurred until Emma was approximately twelve-years-old. By this time, Jarrett testified, Emma was desirous of spending more time with her friends, so visitations were reduced to once a month.

{¶80} On cross-examination, Jarrett testified that Emma always seemed to enjoy spending time with Nancy and Starner and that Emma always had the choice to visit or not visit the Starners. He further testified that he had no knowledge of any inappropriate behavior by Starner and that he would not have allowed Emma to go to the Starner home if he had thought she was being hurt. He also admitted to telling the defense's investigator that he had concerns that Emma's mother had put her up to making these allegations when he heard of them.

{¶81} The State also presented the testimony of Arden Witt, who worked in the revenue operations department of First Energy Ohio Edison. She testified that 331 Church Street, an apartment building to which First Energy supplied electricity, is located in Marion County, Ohio. Witt also testified that Dani Starner continuously received the electricity billing for an apartment in that building from September 12, 2002, until April 17, 2008.[6]

{¶82} In light of all this testimony, there was sufficient evidence that, if believed, would convince the average mind of Starner's guilt beyond a reasonable

---

[6] Witt also testified that Dani Starner changed apartments within the same building on two occasions during this time frame and at some point informed First Energy that she had wed and changed her name on her billing to Dani Bristel.

doubt of Counts 6-12. Each location was in Marion County, Ohio. Emma recalled these acts of touching occurring nearly every visit she had with Starner beginning from approximately the year 2000 and continuing until she was approximately twelve. A conservative calculation of the number of weekends alleged in the indictment and testified to by Emma places the number of times Starner perpetrated these acts at over 100, well beyond the seven acts for which Starner was found guilty. These acts included her touching Starner's penis with her hand, him touching her vagina, breasts, and buttocks, and him touching his penis to her vagina by having her sit on him while both were naked and at least once where he placed his penis on her vagina and had her guess what was against her. Further, as previously noted, there was no dispute that Emma was not Starner's spouse or that she was less than thirteen years of age. Thus, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of Counts 6-12, gross sexual imposition, proven beyond a reasonable doubt.

{¶83} To prove Counts 17 and 19, both of which were for rape, the State had to show that Starner purposely engaged in sexual conduct, specifically cunnilingus, with Emma, who was not his spouse, when she was less than thirteen years of age, whether or not he knew her age. In addition, the State had to show that these counts occurred in Marion County, Ohio (each was alleged to have occurred at 3915 Richland Road, Marion, Ohio). Count 17 was alleged to have

-36-

occurred on or about July 1, 2003, to December 31, 2003, and Count 19 was alleged to have occurred on or about January 1, 2004, to May 8, 2004. As previously noted, both of these counts contained additional specifications that Emma was under the age of ten at the time of the respective offenses.

**{¶84}** Counts 21 to 32, each a charge of rape, required the State to prove that Starner purposely engaged in sexual conduct with Emma, who was not his spouse, when she was less than thirteen years of age, whether or not he knew her age. The State also had to prove that these offenses occurred in Marion County, Ohio (each was alleged to have occurred at 3915 Richland Road, Marion, Ohio), and when these occurred. Each of these counts covered a specific five to six-month time period and involved a certain form of sexual conduct.

**{¶85}** The time frame alleged in Counts 21 and 22 was from on or about May 9, 2004, to December 31, 2004. Count 21 involved the act of cunnilingus, and Count 22 involved the act of fellatio.

**{¶86}** The time frame alleged in Counts 23 and 24 was from on or about January 1, 2005, to June 30, 2005. Count 23 involved the act of cunnilingus, and Count 24 involved the act of fellatio.

**{¶87}** The time frame alleged in Counts 25 and 26 was from on or about July 1, 2005, to December 31, 2005. Count 25 involved the act of cunnilingus, and Count 26 involved the act of fellatio.

{¶88} The time frame alleged in Counts 27 and 28 was from on or about January 1, 2006, to June 30, 2006. Count 27 involved the act of cunnilingus, and Count 28 involved the act of fellatio.

{¶89} The time frame alleged in Counts 29 and 30 was from on or about July 1, 2006, to January 1, 2007. Count 29 involved the act of cunnilingus, and Count 30 involved the act of fellatio.

{¶90} The time frame alleged in Counts 31 and 32 was from on or about January 2, 2007, to May 8, 2007. Count 31 involved the act of cunnilingus, and Count 32 involved the act of fellatio.

{¶91} In addition to providing the previously detailed testimony, Emma testified that Starner eventually began to place his mouth on her vagina. She stated that neither one of them would be wearing any clothes and that Starner would have her lie down on his bed and then "put his mouth on [her] vagina and move his tongue around" in her vagina. (Trial Trans. p. 234.) She testified that this was the type of act that occurred most often involving her body.

{¶92} Emma also testified that Starner later began to have Emma put her mouth around his penis and move her head up and down. During these acts, his penis became larger and "white stuff" would come out. (id. at 236.) Emma also testified that Starner had her swallow the "white stuff" once and that she "gagged." (id.) She further stated that this was the type of act involving his body that occurred most often. Lastly, Emma testified that his act of putting his mouth

on her vagina and her act of putting her mouth around his penis occurred "[p]retty much every weekend" since she was "[p]robably about 10." (id. at 276-7.) However, during cross-examination, Emma explained that Starner began putting his mouth on her vagina when she was eight or nine-years-old.

{¶93} In light of all this testimony, there was sufficient evidence that, if believed, would convince the average mind of Starner's guilt beyond a reasonable doubt of Counts 17, 19, and 21-32. Each incident occurred at Starner's home in Marion County, Ohio. Emma recalled that these acts occurred nearly every visit she had with Starner beginning approximately from when she turned eight in the year 2002, or nine in the year 2003, and continuing until she was approximately twelve in the years 2006 to 2007. A conservative calculation of the number of weekends alleged in the indictment and testified to by Emma places the number of times Starner perpetrated these acts at over 75, well beyond the fourteen acts for which Starner was found guilty. These acts included both cunnilingus and fellatio. Further, as previously noted, there was no dispute that Emma was not Starner's spouse or that she was less than thirteen years of age. In addition, Emma's testimony placed at least two acts of cunnilingus as occurring when she was under ten years of age. Thus, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of Counts 17, 19, and 21-32, rape, proven beyond a reasonable doubt.

{¶94} For all these reasons, the fourth assignment of error in regards to the sufficiency of the evidence is overruled as to all twenty-two counts.

{¶95} Our review does not end here, however, as Starner also challenges the manifest weight of the evidence on each count. As previously noted, this Court sits as the "thirteenth juror" and weighs the evidence and all reasonable inferences therefrom. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶96} In addition to the aforementioned testimony from Agent Hawke, Deputy Butterworth, Emma, Doug, Meg, Vicky, Jarrett, Arden Witt, and Jill Neidhart, the State presented twenty-nine photographs of Emma, some in provocative poses, which were all placed on the hard drives when she was twelve, according to each of their respective "created dates." (State's Exh. 27a). Emma testified that Starner took these photos of her, told her how to pose in some of them, and also took photos of her while she was nude.

{¶97} Emma further testified that Starner showed her videos of adults having sex and showed her photographs of both men and women "showing their private areas" while completely naked. (Trial Trans. pp. 239-40.) She also testified that Starner would walk around without his clothes on sometimes and spoke with her about becoming a nudist. Specifically, she testified that Starner told her that he could not have her be a nudist at that time without her father's permission and that he knew her father would not give her permission but that

when she turned eighteen, he would take her to a nude beach. He also showed her photographs of people on a nudist beach.

{¶98} The State also introduced the pornographic photographs of adults engaging in sexual activity and of numerous women posing nude that Agent Hawke found on Starner's computer equipment. (State's Exh. 27a.) Included in these photographs was a picture of a group of seventeen nude adults posing in the water along a beach with some other nude people in the background who appeared to be sunbathing on the beach.

{¶99} In addition, the State submitted the sixty-one sexually explicit stories, most of which involved acts of molestation and/or incest with young children, which were found on the hard drive in the attic. (State's Exhibits 27b 30-91.) The State also submitted photographs of the exterior and interior of Starner's home, photographs of the field, the inventory lists of items seized from Starner's home during the execution of the search warrants, the testimony of the officers who conducted the searches, the computer equipment that was seized, printouts from Evidence Eliminator's website, Nancy's employment attendance records for the years 2005-2007, Nancy's college class schedule from the spring semester of 2006 until the fall semester of 2007, which included Saturday classes,

Emma's medical records from Children's Hospital, and the testimony of various other witnesses.[7]

{¶100}    One such witness was Ann Underwood, the school nurse for Emma when she was in fifth grade. Underwood testified that she speaks with fifth graders at her school about communicable diseases, which includes a discussion of "good touch/no touch areas" and the showing of videos about the physical development of girls and boys and one about reproduction. (Trial Trans. pp. 490-1.) She testified that Emma attended this class in May of 2006. She also testified during cross-examination that Emma never reported any abuse by Starner to her and had never been told that Emma reported being sexually abused to any school officials.

{¶101}    Kerri Marshall, a social worker at Columbus Children's Hospital, also testified on behalf of the State. She testified that she works in the Children's Assessment Center, a clinic at the hospital that specializes in treating children when there are allegations of abuse, and her duties include interviewing those children and reporting the information she obtains to the doctor to assist in the medical examination of the child. In the course of her eight years of employment in this field, she has interviewed approximately 2,900 children and has become familiar with different things that arise in sexual abuse cases, such as

---

[7] Included in these witnesses was a representative of Nancy's employer, State Farm Insurance, who testified that Nancy began her employment with State Farm in November of 1994, that the company began keeping attendance records electronically in 2005, and that Nancy's absences from work were not excessive or otherwise out of the ordinary from other employees.

the grooming of children by photographing them, buying them gifts, giving them money, and keeping secrets between the child and abuser.

{¶102} Marshall also testified that in many instances the child and perpetrator have bonded, the child usually expresses no hatred toward the offender, and some children continue to express love for the offender. She further testified that children also are told that the child and/or offender will "get in trouble" if the child tells and that children may fear that they will be held responsible for allowing it to happen and/or fear that they will be blamed for "tearing [their] family apart." (Trial Trans. p. 328.)

{¶103} On February 14, 2008, she interviewed Emma at the Children's Assessment Center. Emma came to the Children's Assessment Center on that date after reporting to another social worker during her hospitalization on the 9th of February that she had been sexually abused. Marshall made a written report of her interview with Emma, which was admitted at trial as State's Exhibit 31.

{¶104} During the interview, Emma reported much of the information to which she testified at the trial regarding the touching of her body and Starner's body, the acts of cunnilingus and fellatio, the time he had her swallow his ejaculate and her reaction to this, the incident involving her cousins, the locations of these incidences, the incident in the kitchen, that this began when she was approximately six-years-old and ended when she was twelve or thirteen,

that he told her that they would both get into trouble if anyone found out, that Starner took several photos of her both clothed and unclothed, that he showed her pornographic videos and photos of adults, and that they looked at his sperm under a microscope. She also disclosed, and later testified, that when she questioned Starner or objected to his actions, he would ignore her for awhile. Emma also revealed to Marshall that towards the end of this abuse, Starner told her that if she ever felt like she wanted to have sex, meaning vaginal intercourse, that he would do that with her, a statement she also testified to at trial.

{¶105} Emma made many other disclosures to Marshall to which she did not testify at trial as well, including that Starner penetrated her vagina and anus with his finger and that he had her take a picture of her own vagina. She also described an incident where Starner wanted to show her "what it would feel like if someone kidnapped me[,]" and he put his sock in her mouth and put tape over her mouth. (State's Exh. 31.) However, when she began gagging because the sock was big, he removed the tape and the sock. Emma also stated that there were multiple times in the cornfield with Starner and her cousins and that Starner touched all three of them in their private areas and that the children resisted this touching. She also told Marshall that Starner wanted Meg to put her mouth on Doug's penis but that Meg refused and that she touched Meg's vagina with her hands.

{¶106}     After this interview, Emma was physically examined by Kristen Upton, a nurse practitioner, under the supervision of Dr. Jonathan Thackeray, a child abuse pediatrician. This examination included an examination of Emma's anal and vaginal areas. Nurse Upton made no abnormal findings.

{¶107}     Dr. Thackeray testified that 95-96% of girls who have been sexually abused have normal "anal genital examinations." (Trial Trans. pp. 362-3.) He explained that many times the abuse is not reported until quite a while after the abuse has occurred and that any damage that may have been found will often have healed by the time the child reports the abuse and is examined. He further explained that the genital tissue heals very rapidly. In addition, some forms of abuse would not cause injury, such as touching, kissing, or exposure to pornography, or the abuse may not have occurred in a violent manner due to the relationship between the victim and perpetrator. Moreover, Dr. Thackeray explained that the vagina, and in particular the ring of tissue called the "hymen," is highly elastic and designed to stretch to allow the body to prepare for childbirth at some point in time. Therefore, this area often times will not appear abnormal even if penetration of some sort has occurred. Thus, he concluded that Nurse Upton's findings were consistent with the history provided by Emma. However, during cross-examination, Dr. Thackeray admitted that the lack of findings in Emma's examination were also consistent with a child who had suffered no abuse at all.

{¶108}    In Starner's case-in-chief, he presented the testimony of several witnesses, including two school guidance counselors and one school principal. David Hinds, Doug's school counselor for the last two years, and Jim Boyd, Meg's school counselor for the last three years, both testified that neither child reported being sexually abused to them or to any other school officials and that neither saw any signs or behaviors in the children that would indicate they were sexually abused. Likewise, Lynn Hursey, Emma's school principal during the 2006-2007 school year, testified that Emma never reported any sexual abuse to her or any other school official and that she did not notice any signs or behaviors that would indicate Emma was being sexually abused.

{¶109}    However, on cross-examination, all three admitted to having limited contact with the children and to being responsible for many children in their scope of employment. They also admitted to having little to no contact with children who they know have been sexually abused, acknowledged that sexual abuse is often unreported, and that it was possible that they each interacted with students who might very well have been sexually abused and they did not know. They further acknowledged that they were not testifying that the children were or were not sexually abused by Starner.

{¶110}    Starner also presented the testimony of two forensic scientists from BCI. Travis Worst testified that he tested various items submitted by the Marion County Sheriff's Office in this case for the presence of bodily fluids, such

as semen, amylase, blood, urine, and feces. In the cup of one bra, he found amylase, a substance found in saliva and some other bodily fluids. He cut out the portion of the bra where he found the amylase, packaged it, and stored it for DNA testing. He also found amylase in a pair of white girls' underwear. However, he testified that this coincided with a brown stain in the underwear and that amylase is also found in feces so he did nothing more with the underwear. Other than these two findings, Worst found no other bodily fluids on any of the items submitted.

{¶111} The portion of the bra containing amylase and the white underwear with amylase found on it were then tested for DNA. Emily Draper, a DNA forensic scientist, testified that she did not participate in examining the items in this case but that she was a technical reviewer on the case and was testifying as to the results in this case because the actual examiner was on his honeymoon. The DNA found in both the bra and the underwear did not belong to Starner or to Emma. In addition, the DNA found in the bra belonged to two different people. However, no other comparison standards were given to BCI to attempt to determine whose DNA it was.

{¶112} On cross-examination, Worst testified that he has frequently not found any semen and/or amylase when examining multiple items in sexual abuse cases and that he would not expect to find bodily fluids on clothing where the type of abuse was the touching of one body part to another, such as a hand to a breast. Additionally, he testified that his examination could not determine whether

semen or amylase had ever been on one or more of these items because they could have been washed.  Draper testified during cross-examination that amylase can easily transfer onto clothing when someone is talking or living in a household with other people in close proximity.  Further, she testified that DNA testing is expensive and that BCI has such a backlog of DNA requests that it has had to put guidelines and priorities on what it will test.  As to the underwear, Emma testified that it did not belong to her.

{¶113}    The defense also presented the testimony of James Denton, the auctioneer who sold Nancy's property the April following her death.  Denton testified that one of Starner's step-daughters approached him before the auction and wanted to know why he was there and to object to the auction.  In addition, both of Starner's step-daughters made statements during the auction about the charges pending against Starner, and Denton had to ask them to stop making these types of statements, a situation he had not previously encountered during an auction.

{¶114}    Dr. Kevin Haney also testified for the defense.  Dr. Haney, a family physician, testified that Starner came to him on February 29, 2008, complaining of sexual dysfunction.  Starner told him that he was married, had difficulty in his sexual life with his wife, his wife was ill, and "that he had a long term history of not being able to be aroused and perform sexually."  (Trial Trans. pp. 969-70.)    Dr. Haney examined Starner and did a blood draw to run a

chemistry panel to determine the cause of his dysfunction. The results showed that Starner's testosterone level was below 350, specifically it was 310. Dr. Haney further testified that this level, coupled with the history Starner provided, indicated a condition called hypogonadism, which means low sex hormones. People with this condition typically have low energy, low drive, low motivation, decreased arousal, decreased ejections, and frequency decreased ejection force and strength. In addition, Dr. Haney testified that to a reasonable degree of medical probability he would not expect Starner to be able to get a normal erection and that it would be unlikely to expect any ejaculation at all. (id. at 974-5). He was also unaware of any method by which Starner could have reduced his testosterone level. To treat Starner, Dr. Haney testified that Starner needed testosterone replacement either through injection or patches for at least six months to increase his levels.

{¶115} During cross-examination, Dr. Haney admitted that he could not state conclusively that Starner could not get an erect penis. Further, he acknowledged that Starner's low testosterone level did not mean he was incapable of getting an erection and that he was taking into account both the testosterone level and the information provided to him by Starner to reach his medical conclusions. Moreover, he testified that if he had been given the description that the children gave of Starner's penis at the cornfield, that this would change his opinion about Starner's complete level of impotence. However, it would not necessarily have changed his diagnosis of hypogonadism because people with this

condition can still "get erections or versions of erections." (id. at 982.) He also acknowledged that the first time he saw Starner was nine days after February 20, 2008.

**{¶116}** The last person to testify on Starner's behalf was Greg Kelly, the computer expert retained by the defense. Kelly testified that he reviewed the information given to him by BCI, including the report of Agent Hawke's findings, forensic images of the twelve computers and various portable drives seized from Starner's home, and a number of discs. Much of his testimony was similar to that provided by Agent Hawke as to what was found on the computer equipment.

**{¶117}** However, the bulk of his testimony focused on Evidence Eliminator. Specifically, he testified that its function is similar to an entire host of programs with less innocuous names that are designed to securely delete files and other activity on a computer, such as Window Washer, C Cleaner, and Cyber Scrub. (Trial Trans. p. 1008.) Further, the general public uses these programs, and Evidence Eliminator's use is becoming more common as people become more aware of what things can be found on a computer. He also testified that he found no evidence on the computers that Evidence Eliminator's website, which marketed the program, had ever been accessed by one of the computers.

**{¶118}** Evidence Eliminator also has the ability to automatically log all of the tasks it performs, but by default this feature is not turned on. In this case, the kitchen computer with this program on it had multiple tasks logged,

which had to be performed manually. The files that were securely deleted, according to the log, included some text files, only one picture, and some temporary files. He also testified that the last access date of a file can be done by an individual or a process, such as the routine, pre-set running of an antivirus program, defragmentation program, or other application applied to all files.

{¶119} During cross-examination, Kelly testified that his company received a retainer fee of $5,000.00, which was fully used, and a second payment of $5,000.00, which was currently being used to fund his analysis and testimony, in this case. He acknowledged that the hard drive found in the attic with the erotic stories and the majority of the pornographic photographs and photographs of Emma found on it was last accessed by connecting it to the kitchen computer on February 16, 2008, and that there was no way to tell whether Evidence Eliminator had been used on that hard drive unless someone manually elected to save a log of such activity. In addition, the version of Evidence Eliminator he found on the kitchen computer was installed on January 8, 2008, and this version had a log of its tasks. However, another version of this program was previously installed on April 9, 2007, and he could find no log of its tasks.

{¶120} Kelly also conceded that a person could transfer files to a computer space such as a recycle bin and then use Evidence Eliminator to clean the recycle bin and there would be no way to determine the names or types of files that were in the recycle bin at the time the bin was securely deleted. He also

testified that Evidence Eliminator deleted a variety of documents out of different drives from January 8, 2008 until February 18, 2008, and that on February 18, 2008, alone, this program cleaned out eighty-four files from the recycle bin. Kelly further testified that someone had to have been at the keyboard each and every one of these days directing what files Evidence Eliminator was to delete rather than this program having been pre-set to automatically run. Moreover, he conceded that the report provided to the court by his employee, Nick Ventura, indicated that everything done with Evidence Eliminator during this time frame was "done from the Dan user account." (Trial Trans. pp. 1074-5.)

{¶121} Given all of this testimony, this Court does not find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. To the contrary, the children gave detailed accounts of at least one incident at the cornfield, which matched one another in many aspects from wading in the stream, whose clothes were off and at what point, the game that was played, who touched who, and the condition of Starner's penis. The differences in their respective versions of events were minimal and were reasonable in light of their different locations in the cornfield and because, as noted by both Emma and Meg, this type of incident happened more than once. Furthermore, they testified that this happened in a *cornfield*, near harvest time, just before or during Nancy's illness, and the corroborating witnesses established that the field where the children said this occurred had corn planted in

it when Nancy was ill, which would have been harvested in late October. In addition, Starner had ample access to these children without the presence of any other adult.

{¶122} Emma also provided many specific details about the abuse she suffered for years, how it progressed, the types of things she and Starner would do, and where these things happened. Although Emma's statements to the social worker included more acts than her testimony revealed and was more detailed as to the walks in the field with her cousins, this does not render these two accounts contradictory to one another. Rather, Emma's testimony centered largely around the charges brought by the State and indicted by the grand jury. The fact that she revealed more incidences than were ultimately charged does not make her testimony unreliable.

{¶123} In fact, many of the details she provided to the social worker were later supported by the evidence found in the investigation: she said Starner had her look at pictures of women's vaginas and other nude photos of adults engaged in sexual activity, BCI found those on his computer; she said he took photos of her, BCI found those on the computer; she said Starner showed her a photo of nudists on a beach, BCI found a photo of that on his computer; she said sometimes he would abuse her in an apartment building where his daughter lived and was able to identify the building, First Energy confirmed that his daughter occupied an apartment in that building during the relevant time frame; she said

they would look at his sperm under a microscope, the investigators found a microscope in his home; she said she thought this activity was normal until she watched a video at school when she was twelve, her school nurse confirmed in May of 2006, the month Emma turned twelve, she held a class that discussed inappropriate touching and showed videos of human reproduction and the development of boys and girls.

{¶124}     Although no nude photographs of Emma and no pornographic videos were found, this also does not discount Emma's testimony because there were any number of opportunities to discard these and varying reasons why these were not found, including through a program such as Evidence Eliminator. Emma also testified that she saw him delete nude photos of her and that in at least one of the nude photos of her, Starner deleted it because he told her that the police would be able to see the freckles on her legs and know it was her even without seeing her face. In addition, the lack of physical findings during Emma's anal genital exam was consistent with the types of activity she disclosed and the failure to immediately report the abuse. The same is also true for the fact that Starner's bodily fluids were not found on the clothing that was seized or the microscope because of the ability to wash these items and the nature of the contact.

{¶125}     Not only were there corroborating witnesses and evidence for Emma's testimony, there were other details that cannot be overlooked. Starner had sixty-one erotic stories largely consisting of graphic tales of the molestation of

young children and of incestuous relationships. There was also no evidence, only innuendo by the defense, that the mothers of the children, Starner's stepdaughters, were outraged that Starner received the bulk of their mother's estate. Indeed, they indisputably appeared to have been upset at the auction of this property in April of 2008. However, the statements they made about the charges against Starner and believing that the auctioneer should not be there could be as equally, if not more so, explained by them being upset that he abused their children and was now auctioning their mother's property to possibly help pay for his legal defense as he was incarcerated at the time.

{¶126}     In short, the twenty-two verdicts of guilty were not against the manifest weight of the evidence. Therefore, the fourth assignment of error is overruled in its entirety.

*Third Assignment of Error*

{¶127}     Starner asserts in his third assignment of error that his right to the assistance of counsel was violated because each of his three trial attorneys was ineffective. In support of this contention, he maintains that trial counsels' performances were ineffective in a variety of ways: (1) counsel failed to timely and adequately object to the misconduct of the prosecution; (2) counsel failed to renew its objection to the State's presentation of testimony about Evidence Eliminator; (3) counsel failed to object to an improper jury instruction about Evidence Eliminator; (4) counsel failed to timely and adequately move for

judgments of acquittal. In addition, Starner contends that even if these deficiencies were not prejudicial, when evaluated individually, their cumulative effect was prejudicial.

{¶128} When considering the issue of ineffective assistance of counsel when a trial has taken place, a reviewing court must consider "whether the accused, under all the circumstances * * * had a fair trial and substantial justice was done." *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905, 1999-Ohio-102. In addition, attorneys licensed by the state of Ohio are presumed to provide competent representation. *State v. Hoffman* (1998), 129 Ohio App.3d 403, 407, 717 N.E.2d 1149.

{¶129} Ohio has also adopted the two-part test for determining whether a criminal defendant has been denied the effective assistance of counsel established by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. "A convicted defendant must first show that his attorney's performance 'fell below an objective standard of reasonableness,' and must then show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Dixon*, 152 Ohio App.3d 760, 790 N.E.2d 349, 2003-Ohio-2550, at ¶ 39, quoting *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052.

{¶130}     As to the first prong of the test, courts are to afford a high level of deference to the performance of trial counsel. *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373. The second prong regarding reasonable probability requires a probability sufficient to undermine the confidence in the outcome of the trial. *Id.*

{¶131}     Even assuming arguendo that all three of Starner's trial attorneys' performances fell below an objective standard of reasonableness,[8] given this Court's decisions as to the first, second, and fourth assignments of error, Starner's contentions fail the second prong required by *Bradley* and *Strickland* that there be a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. Furthermore, as previously outlined, the record demonstrates that Starner had a fair trial and substantial justice was done. Thus, the third assignment of error is overruled.

{¶132}     For all of these reasons, the judgment of the Court of Common Pleas of Marion County, Ohio, is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jnc**

---

[8] This assumption should not be construed as a finding that trial counsels' performances fell below an objectively reasonable standard. Rather, we need not discuss this prong in light of the other assignments of error.